IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHN J. SHUFELDT, M.D.,               )
                                       )
        Plaintiff,                     )
                                       )        NO. 3:17-cv-01078
v.                                     )        JUDGE RICHARDSON
                                       )
BAKER, DONELSON, BEARMAN,             )
CALDWELL AND BERKOWITZ, P.C.,         )
                                       )
        Defendant.                     )

## MEMORANDUM OPINION

Pending before the Court is "Defendant's Motion for Summary Judgment" (Doc. No. 214, "Motion for Summary Judgment"), "Defendant's Motion for Leave to File Under Seal" (Doc. No. 218, "Motion to File Under Seal"), "Defendant's Motion to Exclude Shufeldt Expert Disclosure" (Doc. No. 220, "Motion to Exclude Shufeldt"), and "Defendant's Motion to Exclude Plaintiff's Expert Testimony Regarding Rescissory Damages" (Doc. No. 222, "Motion to Exclude Rescissory Damages Expert").

## BACKGROUND[1]

_____

[1] The facts set forth in this section are undisputed, the term the Court will use to describe both facts that are not in dispute *at all* and facts that are not in *genuine* dispute. Most of these facts come from Plaintiff's response (Doc. No. 235, "Response to Defendant's Statement of Undisputed Facts") to Defendant's "Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment" (Doc. No. 216 "Defendant's Statement of Undisputed Facts); after Defendant asserted these facts in Defendant's Statement of Undisputed Facts, they went undisputed by Plaintiff in his Response to the Statement of Undisputed Facts. Other facts (background, uncontroversial ones) are mutually stated in the parties' opposing briefing and therefore are taken by the Court as undisputed. In stating the facts herein, the Court often uses the language used by the party that asserted the facts in the first instance; this helps the Court ensure that the facts as stated herein are undisputed, even if the language used is less precise or thorough than the Court would have used were it writing on a blank slate.
    On July 25, 2023, Plaintiff filed "Plaintiff's Unopposed Motion to File Corrected Response Memorandum Effective July 18, 2025" (Doc. No. 245) wherein Plaintiff requested leave to file the amended (i.e., corrected) memorandum (attached as Doc. No. 245-1) in response to the Motion for Summary

NextCare Holdings, Inc. ("NextCare") is a corporation that owns and operates urgent care facilities. NextCare was incorporated in Delaware, and Plaintiff was its founder, CEO, Chairman, and largest shareholder. (Doc. No. 245-1 at 11). As a result of a stock transaction in 2008, Plaintiff had the right to appoint four directors (one of which was himself) and EEF had the right to appoint three directors to NextCare's board. Plaintiff appointed himself, Fred Brown, Breaux Castleman, and David Lowenberg to NextCare's board. EEP appointed Malcolm Kostuchenko and Andrew Paul, both of whom were directly affiliated with EEF, and Don Steen (now deceased). Following

---

Judgment for the stated purpose of filing corrected the omission of certain citations to the record. The Court granted the motion as unopposed and as well-taken, given the obvious benefits of having complete citation to the record. (Doc. No. 259).

The Court must urge counsel to be more forthcoming regarding the alterations they make (and intend to make) to revised documents. The Court's review of Plaintiff's amended memorandum in response to the Motion for Summary Judgment indicates that there were a few changes to the substantive text. While the Court does not find that any of these changes are of consequence and would alter the Court's decision here, the Court is nevertheless concerned with the fact it was asked to and did grant a motion on the basis of the motion being unopposed, when the motion may have been opposed had Defendant been aware that other changes had been made.

Plaintiff filed his Response to Defendant's Statement of Undisputed Facts to on July 18, 2023, contemporaneously with filing his original response in opposition to the Motion for Summary Judgment (Doc. No. 231). Then, on July 25, 2023, Plaintiff filed Plaintiff's Statement of Additional Material Facts (Doc. No. 248), to which Defendant responded (Doc. No. 256). The Court will not accept Plaintiff's Statement of Additional Undisputed Facts, because it was untimely filed, and Plaintiff did not seek leave to make such a late filing. Under LR56.01(c), additional undisputed material facts are to be contained within the non-movant's response to the movant's statement of fact. Plaintiff filed its Response to Defendant's Statement of Undisputed Facts a week earlier and did not include therein the substance (or the form) of Plaintiff's Statement of Additional Material Facts. As indicated in the title of his motion (Doc. No. 245), Plaintiff sought leave specifically to amend its memorandum in response to summary judgment. As noted above, Plaintiff attached to the motion the proposed amended response, and Plaintiff cited in his motion the docket entry of the document to be amended (Doc. No. 231, his original response to the Motion for Summary Judgment). In this motion, Plaintiff sought leave only to file an amended response for the purpose of providing omitted citations—not leave to file leave to file an amended response to Defendant's statement of material facts to include purported additional undisputed material facts (nor, for that matter, leave to present purported additional undisputed material facts in some other way). It makes no difference to the Court that Defendant replied to this statement of facts (Doc. No. 248), as Defendant may have done so purely as a precautionary measure in case the Court accepted the late-filed addition. Nevertheless, in certain instances where helpful, the Court will accept facts that were undisputed by Defendant in Defendant's reply (Doc. No. 248) because there appears to be no genuine dispute as to those facts.

another stock transaction in 2009, Plaintiff owned a 41.22% interest and EEF owned a 25.16% interest in NextCare.

Prior to their appointment, Messrs. Brown, Castleman, and Lowenberg had no relationship with Plaintiff, NextCare, or EEF, and they did not have business, family, or financial ties to EEF. During the time they served on NextCare's board, they voted in a manner they believed was in the best interest of the company. Despite being appointed by EEF, Mr. Steen was an independent (in the sense discussed below) board member, and he had no prior affiliation with EEF and was not beholden to EEF. There is no evidence that Mr. Steen ever felt pressured (by anyone) to vote any particular way.

In 2009, Blue Cross Blue Shield of North Caroline ("BCBS"), NextCare's largest payor in its second largest market, disputed the medical necessity (to patients covered by BCBS) of services provided to patients under NextCare's allergy and flu testing program.[2] By the second quarter of 2010, BCBS removed NextCare from its network and demanded that NextCare reimburse BCBS approximately $2.5 million that BCBS had paid for tests administered to patients. In August 2010, the United States Department of Justice ("DOJ") served NextCare with a subpoena, advising that it was investigating whether NextCare had engaged in unnecessary testing ultimately paid for by Medicare. DOJ took the position that the billing of Medicare for services under the testing program constituted Medicare fraud and initially sought over $35 billion total in fines and treble damages. From August to October 2010, certain other NextCare payors, including Aetna, CIGNA, Blue Cross Blue Shield of Arizona, and Blue Cross Blue Shield of Texas also objected to the testing program and demanded reimbursement amounts in the hundreds of thousands of dollars.

---

[2] Plaintiff disputes this fact by saying "[s]ometime in 2009 BCBS sent a letter to an office in North Caroline inquiring about the test." This does not explain what dispute exists. Any inquiry into the test could very well have been an inquiry into the medical necessity of the test.

Plaintiff resigned from the board in 2010, and the context of that resignation and the significance to the present discussion is debated between the parties. The Court takes up that issue as necessary below but suffice it to say here that Plaintiff alleges that he was scapegoated for the problems resulting from the testing programs and forced out as part of EEF's conspiracy to take over NextCare. Regardless of how and why his resignation occurred, when he resigned in 2010 the other six directors (Brown, Castleman, Lowenberg, Steen, Pail, and Kostuchenko) remained in place. Kostuchenko became Chairman, and John Julian became CEO.[3] By mid-August 2010, the board reached a consensus: the company would face stark financial consequences without a cash infusion by October 2010. So in September 2010, the board approved a $4 million preferred equity funding based on the issuance of NextCare preferred stock (Series C Preferred Stock) that could be converted to common shares at a price of $0.07 per share. Initially, EEF and Goldman Sachs Specialty Lending Group ("Goldman Sachs") were involved and had agreed to fund pro rata portions of $2.4 million and $1.6 million, respectively. But in early October, 2010, Goldman Sachs announced that it had decided not to fund its pro rata share, while EEF remained willing to make its investment, but only at a lower conversion price of $0.02 per share. The two EEF-affiliated directors (Kostuchenko and Paul) abstained from all voting on the proposed issuance, and the four remaining directors unanimously approved the issuance of Series C Preferred Stock at a conversion price of $0.02 per share ("Series C Stock Transaction").

In October 2010, NextCare sent all stockholders, including Plaintiff, a copy of the "Notice of Taking Action" and the Series C Preferred Stock Purchase Agreement.

The Notice of Taking Action stated in part:

On October 4, 2010, the stockholders of the Company ... approved the consummation of a **_Series C Preferred Stock_** financing with certain of the

---

[3] The record does not reflect that anyone replaced Plaintiff on the board during the events at issue in this case.

> Company's existing investors, pursuant to a Series C Preferred Stock Purchase Agreement (the "Stock Purchase Agreement," whereby the Company is authorized to sell up to 744,601 of newly issued shares of Series C Preferred Stock, par value $0.0001 per share at the purchase price of $10.00 per share and the initial ***conversion price of $0.02 per share*** (the "Series C Preferred Stock") . . . .
>
> * * * *
>
> The Board of Directors of the Company and the requisite majority of the Company's stockholders have approved the Company's efforts to raise up to $7,746,010 through the sale and issuance of up to 744,601 shares of Series C Preferred Stock (the "Series C Financing") in light of the Company's critical need for additional cash funding in order to meet its near term operational cash flow requirements.
>
> * * * *
>
> [T]hrough this Notice, the Company is hereby offering the right to purchase the Series C Preferred Stock to all of its accredited stockholders. ***Please note that the sale and issuance of the Series C Preferred Stock will result in a reduction of the percentage equity ownership of the Company's current stockholders,*** including the current preferred stockholders.

(Doc. No. 235 at 8) (quoting Doc. No. 217-18). The Notice of Taking Action further stated that Plaintiff had the right to purchase up to 325,451 shares of the Series C Preferred Stock based on his existing pro rata ownership interest in the company. After Plaintiff did not participate in the Series C Stock Transaction his equity in the company was diluted.

On February 11, 2013, Plaintiff retained Defendant in relationship to his claims for breach of fiduciary duties against (at least) NextCare. For whatever reason(s)—a reason or reasons not relevant to the pending motions even if relevant to the factual underpinnings of Plaintiff's claims against Defendant—Defendant never filed a suit on Plaintiff's behalf. In March 2015, Plaintiff retained new attorneys, who eventually filed a lawsuit on his behalf (against NextCare, EEF, Julian, and the six directors) before his claims were settled for what ultimately amounted to $7,000,000. On July 24, 2017, Plaintiff filed the original complaint in this case (which was later amended twice) asserting legal malpractice claims against Defendant for failing to file Plaintiff's complaint before the expiration of the statute of limitations (and thereby allegedly weakening his case such that his settlement amounts were a mere fraction of the true value of his claims). The

Court will not detail the facts relating to Defendant's handling of Plaintiff's claim against NextCare, because those facts are not necessary to decide the present motion.

LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. United Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support the [existence of a] material fact," Fed. R. Civ. P. 56(c)(1)(B), for example, the existence of an element of a nonmovant

plaintiff's claim. If the summary judgment movant meets its initial burden, then in response the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Pittman*, 901 F.3d at 628 (quoting *Anderson*, 477 U.S. at 250).[4] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed (*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively) can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1)(B).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (citing *Anderson*, 477 U.S. at 248). Likewise, the "court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman*, 901 F.3d at 628 (citing *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact,

---

[4] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to a fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has

been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla

of evidence in support of the non-moving party's position will be insufficient to survive summary

judgment; rather, there must be evidence upon which the jury could reasonably find for the non-

moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

A defendant-movant cannot meet its initial burden on motion for summary judgment

merely by *claiming* that the plaintiff lacks evidence and essentially challenging the plaintiff to

show otherwise; a defendant-movant must—by pointing to materials of record or otherwise—*show*

(presumptively, subject to the plaintiff's response) that the plaintiff could not prove his claim by a

preponderance. *See* Fed. R. Civ. P. 56(c)(1).[5] In other words, the defendant-movant must produce

evidence *tending to show* (though not necessarily *conclusively showing*) that the plaintiff cannot

raise a genuine issue as to any material fact.[6] *Nickols v. Morris*, 705 F. Supp. 2d 579, 584–85 (N.D.

Tex. 2010) ("The party moving for summary judgment has the initial burden of informing the

Court of the basis for his motion and producing evidence which tends to show that no genuine

---

[5] The undersigned rejects cases that have indicated otherwise. *See, e.g.*, *O.M.A., S.r.l. v. Simon DeYoung Corp.*, No. 1:10CV0861, 2013 WL 7210503, at *3 (N.D. Ohio Mar. 12, 2013) ("[A summary judgment] movant in federal court is not required to . . . provide evidence to show that his opponent has no evidence"), *R&R adopted in part, rejected in part on other grounds*, No. 1:10 CV 00861, 2014 WL 587171 (N.D. Ohio Feb. 14, 2014); *Goldcorp, Inc. v. United States*, No. 00-75043, 2002 WL 551042, at *6 (E.D. Mich. Mar. 27, 2002) ("At any rate, even if [the] affidavit were altogether stricken from the record, it appears that the Government still would be entitled to summary judgment in its favor. After all, this affidavit has been provided merely to prove a negative: namely, that there is no evidence that the IRS ever received the protective claim allegedly sent by Plaintiff on or before September 15, 1995. Presumably, then, the Government could have simply asserted this proposition in its brief, and left it to Plaintiff to introduce evidence calling this issue into question.").

[6] Notably, a defendant-movant typically can show that there is no genuine issue as to any material fact by showing that there is no genuine issue as to the existence of a fact (usually, the element of a claim) that absolutely needs to exist for the plaintiff to prevail. If the defendant-movant can make this showing, all other facts become immaterial (because the plaintiff necessarily will suffer summary judgment anyway), and thus it can be said that the plaintiff (being unable to show a genuine issue as to *one* material fact) cannot raise a genuine issue as to *any* material fact.

issue as to any material fact exists and that he is entitled to judgment as a matter of law."), *aff'd*, 419 F. App'x 534 (5th Cir. 2011).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## ANALYSIS

Defendant states (and the Court accepts) that Plaintiff must prove that but for Defendant's negligence, Plaintiff would have been successful in prosecuting his original suit. (Doc. No. 215, at 12).[7] This inquiry into the "case within the case" asks what the outcome would have been if it had gone before the hypothetical reasonable judge or jury; if summary judgment would have been appropriate on the "case within the case," Plaintiff's case should be dismissed. (*Id.* (citing *Mendoza v. Burke*, 2013 WL 313930 (Ariz. Ct. App. Jan. 28, 2013))).

Defendant argues that Plaintiff would not have prevailed on his underlying breach-of-fiduciary-duty claim against the directors of NextCare, because his claims would have been both subject to the business judgment rule and application of the business judgment rule would have defeated Plaintiff's claims. (*Id.* at 13). The business judgment rule embodies "a presumption that

---

[7] Defendant asserts that the decision about which law applies (Arizona, Alabama, or Delaware) is of no consequence because all three states apply the same approach. Plaintiff does not protest this characterization but cites to Arizona law in its legal standard for the same test. The Court therefore takes Plaintiff to have conceded that the parties agree on the rule to be applied, without deciding at this time what state's law applies.

in making a business decision the directors ... acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation." *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). Under the business judgment rule, unless a shareholder–plaintiff can defeat the presumption, a court will respect the directors' decisions. *Id.* A plaintiff has the burden to defeat the presumption and can do so by showing that the majority of the directors on the board "are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Id.* If a plaintiff succeeds in rebutting the presumption, "the board of directors' action is examined under the entire fairness standard," *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995) (citing *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1371 n. 7 (Del. 1995) (collecting cases), which is a much more exacting standard.

Plaintiff never disputes and therefore effectively concedes that the business judgment rule would have been sufficient to defeat Plaintiff's claims if it was not rebutted, *cf. Emerald Partners v. Berlin*, 787 A.2d 85, 89 (Del. 2001) ("The applicable standard of judicial review often controls the outcome of the litigation on the merits."), so Defendant meets its burden at summary judgment so long as the business judgment rule is not rebutted. Conversely, to avoid summary judgment, Plaintiff only needs to rebut the business-judgment-rule presumption because Defendant did not argue alternatively that it would succeed on summary judgment if the entire fairness standard applied. Plaintiff attempted to rebut the presumption by proving that the board was controlled by EEF when voting on the Series C Stock Transaction and the transaction was self-interested.

Because Plaintiff does not succeed on these arguments, the business judgment rule would not have been rebutted, and Defendant succeeds at summary judgment.

## I.      An Independent Board Approved the Series C Stock Transaction.

The Parties do not dispute that the business judgment rule applies if the board of NextCare made an independent decision. Plaintiff's theory of the case-within-the-case is that a majority of the board was under EEF's "control." Determining whether a defendant who does not have a majority share of the company (like EEF in this case) controls a corporate board requires a context-specific determination. Sources of influence that could contribute to control include the defendant's relationships with particular directors, key managers, key advisors, or commercial entities like key customers or suppliers of the corporation that allow the defendant to hold leverage over the corporation; "the exercise of contractual rights to channel the corporation into a particular outcome"; ownership of a significant (even if not majority) equity stake; the right to designate some directors; "decisional rules in governing documents that enhance the power of a minority stockholder or board-level position"; and "the ability to exercise outsized influence in the board room or on committees, such as through high-status roles like CEO, Chairman, or founder." *Voigt v. Metcalf*, No. CV 2018-0828-JTL, 2020 WL 614999, at *12 (Del. Ch. Feb. 10, 2020) (citing *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, No. CV 11802-VCL, 2018 WL 3326693, at *26–27 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019)). " 'Rarely (if ever) will any one source of influence or indication of control, standing alone, be sufficient to make the necessary showing. . . . [A] reasonable inference of control at the pleading stage[ ] typically results when a confluence of multiple sources combines in a fact-specific manner to produce a particular result.' " *Id.* at *13 (quoting *Basho Techs. Holdco B*, 2018 WL 3326693, at *28). Control can be either general control over the entire

company or control over the specific transaction at issue, *Tornetta v. Musk*, 310 A.3d 430, 499–501 (Del. Ch. 2024), and Plaintiff has invoked both.[8]

Whether a board was controlled or, instead, independent is determined on a director-by-director basis. *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 748 (Del. Ch. 2005), *aff'd,* 906 A.2d 27 (Del. 2006). To establish control over the board, a majority of the voting directors must have been controlled. As a Delaware Chancery Court explained:

> Delaware law presumes the independence of corporate directors. To overcome that presumption, a plaintiff must allege facts as to the interest and/or lack of independence of the individual members of a board. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Plaintiffs can show a lack of independence "by pleading facts that support a reasonable inference that the director is beholden to a controlling person or 'so under their influence that their discretion would be sterilized.' "

*In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 995 (Del. Ch. 2014) (internal citation and footnote omitted), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

Defendant asserts that Plaintiff have had to prove that at least four directors (of the six-person board) were controlled, and in response Plaintiff has not disputed that.[9] So the Court accepts the assertion. Plaintiff lacks evidence sufficient for a reasonable jury to find (by inference or

---

[8] Despite stating that both forms of control existed, Plaintiff did not distinguish between his theories of general control or transaction-specific control when making his arguments.

[9] As noted above, a majority of "voting directors" must have been controlled for the board to have been controlled. Here, Defendant landed on the figure of four directors, presumably under the view that anything less than four would be less than a majority of the six directors. As noted above, two of the six board members abstained on the Series C Stock Transaction, so only four of the directors voted on it (all voting in favor of it). If "voting directors" means only those directors who actually voted on the challenged board action, then in this case three directors would have constituted a majority. But the parties did not raise this possibility. And the Court declines to consider it because Plaintiff did not dispute Defendant's assertion that four directors would have to be conflicted—an assertion the Court accepts as conceded for the purposes of this Memorandum Opinion.

otherwise) that EEF had control over four or more board members so as to overcome the presumption of independence. Plaintiff has an uphill battle to do so, given the preliminary indication that four of the six were independent rather than controlled by EEF. Specifically, it is undisputed that Steen was independent, and that Brown, Castleman, and Lowenberg were: appointed by Plaintiff; had no business, family, or financial ties to EEF; and, most significantly, voted in a manner they believed was in the best interest of the company.

Plaintiff argues that control can be demonstrated through the combination of Kostuchenko being the chairman of the board, EEF allegedly handpicked Julian to replace Plaintiff as CEO and, EEF having a large (albeit not controlling) share, EEF allegedly having a goal of taking over NextCare, and EEF allegedly supplying the board with misleading and incomplete information. Plaintiff does not explain how this combination of factors demonstrates control when it is undisputed that at least Brown, Castleman, Lowenberg, and Steen voted in the way they thought was best for the company. Plaintiff mentions these factors in a narrative of EEF trying to achieve a corporate takeover, but Plaintiff's primary argument seems to be that EEF had control of the board specifically via Kostuchenko's control of the board's information.

Plaintiff alleges that Kostuchenko, in his position as Chairman of NextCare but working on behalf of EEF, purposefully misled the board. Plaintiff alleges that, on the day Goldman Sachs decided not to fund the proposed stock issuance (at the then-proposed conversion price of $0.07 per share), Kostuchenko emailed the board to call a board meeting for the next morning and indicated that EEF would fund the shares on terms different from those previously discussed. It is undisputed that Kostuchenko then emailed a PowerPoint presentation with information about a report ("Arcstone Report") completed by third-party Arcstone Partners and commissioned by EEF for EEF. Plaintiff alleges that Kostuchenko's email and the presentation misdescribed the Arcstone

Report as an "independent evaluation"[10] and explained that EEF was willing to go forward as the sole investor but only if there was a conversion price of $0.02/share. Plaintiff further alleges that at the board meeting the next morning, the board "was not told about Arcstone's discussion of a quick turnaround for the company, or that NextCare had been down to one days' liquidity many times during the Q3/Q4 2010, or that there were better and less drastic alternatives for NextCare than selling equity." (Doc. No. 245-1 at 8 (citations omitted)). Plaintiff further alleges (for what it's worth) that NextCare's CEO (Julian) was both unaware that NextCare paid EEF's legal fees incurred in reaching EEF's agreement with NextCare regarding the Series C Stock Transaction and mistakenly identified EEF's lawyers as NextCare's lawyers.

Overall, as suggested above, Plaintiff's argument seems to be that EEF controlled a majority of the directors on the board by deceiving (via Kostuchenko) them into thinking that approval of the Series C Stock Transaction was in the company's best interest when in reality it was not. Despite making the unsubstantiated allegation that the board was "rushed and panicked," Plaintiff has pointed to no evidence that any board member thought their decision-making process would benefit from more time. Instead, Plaintiff mentions evidence of two board member's rationale for approving the Series C Stock Transaction: Brown's testimony that he thought EEF's

---

[10] Plaintiff has not explained why a third-party evaluation loses its independent character simply because it was commissioned by and for a party to a transaction. The Court wonders why a company would use a third-party if not to have an objective and unbiased view of another company with which it intends to transact. Certainly, EEF conceivably could have been attempting to create the appearance of an unbiased and objective assessment while secretly devaluing the company (NextCare), but such deception would require collusion with Arcstone. The Arcstone Report has no obvious signs of bias or collusion, and Plaintiff has neither identified any indicators of bias nor made any allegations that Arcstone was colluding with EEF. The Arcstone Report also includes disclaimers that it was not completed to reach a predetermined result or value that favored Arcstone's client. The Court does not see anything improper about Kostuchenko describing the Arcstone Report as "independent."

offer was the only way to keep NextCare in business (Doc. No. 245-1 at 14),[11] and Castleman's testimony that the price of two cents per share as "not outrageous," (*id.*). But this testimony does not indicate that either Brown or Castleman felt that he had no choice because of the (alleged) controlling role of EEF. The testimony suggests just the opposite: that both Brown and Castleman considered the proposal for the Series C Stock Transaction and concluded that it was in the company's best interest. In making a decision that they believed to be in the company's best interest, Brown and Castleman exercised their own judgment and, therefore, could not have been controlled. *See In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d at 993 ("That is, under our law, a minority blockholder is not considered to be a controlling stockholder unless it exercises 'such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control.' Accordingly, ***the minority blockholder's power must be 'so potent that independent directors ... cannot freely exercise their judgment, fearing retribution' from the controlling minority blockholder.***") (quoting *In re Morton's Restaurant Group, Inc. Shareholders Litigation*, 74 A.3d 656, 664–65 (Del.Ch.2013))).[12]

Plaintiff's case must rest on the theory that Brown and Castleman were deceived into believing the Series C Stock Transaction was in the best interest of NextCare because of EEF's

---

[11] Brown testified both that NextCare would go out of business without funding from the Series C Stock Transaction funded by EEF and that EEF "was the only organization that was willing to step forward." (Doc. No. 239 at 150:4-24, 152:1-3).

[12] Plaintiff's reliance on *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994), is misplaced. The court there specifically found that "directors deferred to [the controlling shareholder] *because* of its position as a significant stockholder and *not because* they decided in the exercise of their own business judgment that [the controlling shareholder's] position was correct." *Id.* at 1115 (emphasis added). That case involved a minority (but significant) shareholder presenting an ultimatum, accompanied with threats to force out management and a hostile takeover. *Id.* at 1114–15, 1120. Here, Plaintiff does not argue that Brown, Castleman, Lowenberg, and Steen disregarded what they thought was in the company's best interest because of the dominating effect of a minority shareholder; just the opposite, Plaintiff does not dispute that they voted in what they thought was the best interest of the company.

control, but Plaintiff provides no case law in support of the notion that some degree of influence on the board's information is sufficient to prove control.[13] Indeed, as the Court's previous citation indicates, it is far from clear that deception could support a claim of control. Control is typically described as being effectuated by coercion, fear of retribution, or some other type of threat or pressure of which the controlled director is aware—awareness that prevents the controlled director from freely exercising his or her discretion to choose what is in the corporation's best interest. The hallmark of deception is the lack of awareness of the person deceived.

Even if the ability to deceive could be a basis for establishing control, there is insufficient evidence for a reasonable jury to find that EEF actually influenced the information the board considered when deciding on the Series C Stock Transaction. There is no dispute that the board had the full Arcstone Report (not just the allegedly misleading email and PowerPoint summary) and that the report clearly stated that it was completed for "the use and benefit of [EEF] in connection with its consideration of the transaction." (Doc. No. 236 at 5). Further, there is no evidence that the directors failed to consider the full report so as to counteract Kostuchenko's email and power point summary's alleged omission or misrepresentation of information about the report. Castleman even testified that he read through the report carefully. (Doc. No. 238 at 100:12-14). The Court is not persuaded that a reasonable jury could find that any of the voting directors were deceived or that such deception effected control over any deceived voting directors (assuming arguendo there were any).[14]

---

[13] It is unclear whether Plaintiff is arguing that EEF controlled the board because it (via Kostuchenko) controlled the information going to the board or (alternatively or additionally) because EEF's ability to deceive board members itself indicates control over deceived board members (i.e., indicates that board members were subject to manipulation (via deception) by EEF).

[14] Whether the board took sufficient care in asking questions, considering alternatives, and analyzing the report is a different question than the one(s) posed by a claim premised on the coercion perpetrated by a controlling shareholder. But Plaintiff has not raised that question, and indeed he has not asserted any claim

Plaintiff offers a "demonstrat[ion]" of EEF's control, (Doc. No. 245-1 at 11), through the example of Plaintiff's removal from the board. Plaintiff alleges that EEF orchestrated Plaintiff's removal by manipulating information presented to the board. The Court will not herein reiterate the lengthy narrative of alleged events regarding Plaintiff's removal from the board, because even if those allegations were substantiated, that would prove only that the board was controlled for *that* transaction (the decision to remove Plaintiff) and would not support that such control was present throughout all board interactions or in the specific transaction at issue here.

To shift the standard by which the Court reviews the board's decision, Plaintiff presents an alternative (though someone related) theory, namely fraud on the board. A "fraud on the board" theory requires Plaintiff to show "1) that [a] fiduciary was materially interested, 2) that the board was inattentive or ineffective, 3) that the fiduciary deceived or manipulated the board, 4) that the deception was material, and 5) that the deception tainted the decisionmaking process of the board." *In re Oracle Corp. Derivative Litig.*, No. 2017-0337-SG, 2023 WL 3408772, at *27 (Del. Ch. May 12, 2023). Defendant argues that even assuming arguendo that a fiduciary (meaning Kostuchenko) deceived or manipulated the board, Plaintiff cannot succeed on this theory, because he has made no attempt to prove that the directors were inattentive or ineffective, the deception was material, and the deception tainted the board's decision-making. *Id.* Plaintiff's cursory mention of fraud on the board is insufficient to sustain the theory. Plaintiff's entire argument in support of the theory is as follows:

> Kostuchenko on behalf of EEF deceived the NextCare directors by representing that the Arcstone Partners valuation which provided the framework for the conversion price analysis was an "independent valuation" when it had been commissioned by EEF solely for its use and benefit. Kostuchenko also kept silent in regard to Arcstone's optimism for a quick end to NextCare's liquidity problems.

_____

or theory beyond the one discussed herein, i.e., that EEF was a controlling minority shareholder by virtue of its deception of the board or control over (misleading) information going to voting board members.

(Doc. No. 25-1 at 15). Plaintiff does not attempt to explain that the directors were inattentive or ineffective, that any of this information was material, and that this alleged deception influenced the decision-making process even though, as explained before, the directors had the entire Arcstone Report.

Because Plaintiff cannot present a genuine issue of material fact that would support shifting the standard of review from the business judgment rule to entire fairness, summary judgment will be granted to Defendant.

## II.     Series C Stock Transaction was Not Self-Interested.

Although the Court agrees that summary judgment against Plaintiff is appropriate based on Defendant's first theory, the Court nevertheless will address Defendant's alternative theory as well. Defendant argues and Plaintiff does not dispute that even if the board was controlled, the business judgment rule nevertheless applies unless EEF's (i.e., the allegedly controlling shareholder's) involvement in funding the transaction was self-interested or not all shareholders were given an equal opportunity to participate in the transaction. Defendant explains:

> "Entire fairness [i.e., the standard applicable only if the business judgment rule is inapplicable] is not triggered solely because a company has a controlling stockholder. The controller also must engage in a conflicted transaction." *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014). Put differently, the business judgment rule applies notwithstanding the presence of a controlling shareholder unless that shareholder "has engaged in a self-dealing transaction." *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 130 (Del. 2007). A transaction is self-dealing only when "a controlling shareholder extracts financial benefit from the shareholders and procures a financial benefit exclusive to himself." *Id.*

> Delaware law recognizes that, (i) when there is a legitimate corporate need to raise capital and (ii) all shareholders are given "an equal opportunity to participate," then "[a]ny disparate treatment . . . is therefore a self-imposed consequence and not the result of any self-dealing." *Watchmark Corp. v. ArgoGlobal Capital, LLC*, 2004 WL 2694894, at *5 (Del. Ch. Nov. 4, 2004); *see also MKE Holdings Ltd. v. Schwartz*, 2020 WL 467937, at *14 (Del. Ch. Jan. 29, 2020). In such a circumstance, the transaction results in "a benefit which devolves

upon . . . all stockholders generally" and is therefore not the kind of self-interest protected against. *Aronson*, 473 A.2d at 812; *cf. Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721-22 (Del. 1971) (business judgment rule applies when all shareholders are given the same rights or benefits, as there is no "self-dealing" in that circumstance). As such, a stock offering that is open to all is not a "self-interested" transaction and is therefore protected by the business judgment rule. *Bennett v. Breuil Petroleum Corp.*, 99 A.2d 236, 239 (Del. Ch. 1953) (when additional shares were issued "to relieve the corporation's critical financial condition by raising additional capital" and existing stockholders were permitted to purchase their pro rata share of additional shares, majority shareholder was not "on both sides of the transaction"); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 150 (Del. Ch. 2003) (plaintiff's "decision not to participate" in additional share offering "cannot, as a matter of law, taint with self-interest" the transaction, because, if everyone had accepted the offer, "a non-pro rata distribution of shares would not have occurred and no 'benefit' would have resulted"); *Long v. Lampton*, 922 S.W.2d 692, 699 (Ark. 1996) (no self-dealing when all shareholders had the right to purchase additional shares at the same price, since "any benefit from the recapitalization plan flowed not only to [alleged controlling parties], but to all other shareholders as well").

(Doc. No. 215 at 19–21).

Again, Plaintiff has an uphill battle, as the undisputed facts demonstrate that the opportunity to participate in the 2010 Series C Stock Transaction (i.e., to buy pro rata amounts of Series C Preferred Stock at a conversion price of $.02 per share) was available to all stockholders, including Plaintiff. It is undisputed that Plaintiff received the Notice of Taking Action and that the Notice of Taking Action advised him of the opportunity to participate in the Series C Stock Transaction, (Doc. No. 217-18 at 3 ("the Company is hereby offering the right to purchase the Series C Preferred Stock to all of its accredited stockholders.")), to avoid dilution of his shares.

Plaintiff argues that the opportunity to participate was "[un]equal" in three ways. (Doc. No. 245-1 at 15–16). Plaintiff argues first that outside shareholders were deprived of an opportunity to participate because the Series C Stock Transaction was "structured . . . to prevent [Plaintiff] . . . from objecting." (*Id.* at 16). Plaintiff provides no explanation of how the structure prevented objection, and therefore the Court assumes that the only structural impediments to objection are

those relating to financial disclosures and timing on which Plaintiff relies in his other two arguments (discussed next).

Next, Plaintiff argues that the shareholders did not have the information that they needed to fully participate and that the circumstances required the directors to meet an "onerous" financial disclosure requirement. (*Id.* at 16–17). However, Plaintiff's single case citation in support of the applicability of an onerous financial-disclosure requirement involves entirely different circumstances involving unique conflicts of interest. (Doc. No. 245-1 at 16 (citing *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1057 (Del. Ch. 1987)). *Id.* ("Where a corporation *tenders* for its own shares, the exacting duty of disclosure imposed upon corporate fiduciaries is even 'more onerous' than in a contested offer. . . . [A]n issuer making a tender offer for its own shares is 'the most inside of insiders' and 'the insider par excellence' . . . . [C]orporate self-tenders, by their very nature, involve built-in conflicts of interest . . . .") (emphasis added) (internal quotations and citations omitted)). The cited case regarding the specific factual scenario of a self-tender offer (which presents unique conflicts of interest)—is not facially applicable where (as here) there was no self-tender offer, and its applicability is unsupported by Plaintiff; the Court thus cannot conclude that this case supports the applicability of a heightened ("onerous") financial disclosure requirement in the present circumstances. Furthermore, the Notice of Taking Action explained that any shareholder considering participation in the transaction had the option to contact the CEO to ask any questions regarding, among other things, "the Company's current operations and prospects or any other information that would assist [the shareholder] in [his or her] decision to purchase the Series C Preferred Stock." (Doc. No. 217-18 at 6). Having not availed himself of that option, Plaintiff cannot fairly claim to have been affirmatively refused the information he needed to participate as an outsider shareholder. So Plaintiff has failed to establish either that he

was entitled without asking to receive financial information he did not receive or that he was entitled to receive financial information he did not receive by virtue of having asked for it. Thus, Plaintiff has failed to explain why non-disclosure to him of certain financial information prevented his equal participation and why the offer of financial information upon request was insufficient, so this argument also fails.

Plaintiff makes a third argument, this one that "the Notice was procedurally infirm and unfair to [Plaintiff], because it gave him no opportunity to make an educated investment decision." (Doc. No. 245-1 at 17). Plaintiff asserts that "Kostuchenko testified that EEF's pre-notice purchase inured to the benefit of the outsiders, because it gave them the opportunity to observe the company's performance before they made their investment decision," but that Kostuchenko "had forgotten" that the deadline gave Plaintiff and the other outside shareholders only two weeks to gauge performance and make a decision. (*Id.*) The problems with this argument are three-fold. First, Plaintiff does not support his implication that a subjective standard (whereby the focus is on the validity of Kostuchenko's belief that the Notice was sufficient) rather than an objective standard governs the sufficiency of the Notice; that is, Plaintiff does not explain why Kostuchenko's vantage point matters. Second, Plaintiff fails to provide any other reason (other than Kostuchenko's opinion)[15] that equal opportunity requires that Plaintiff had to have time to gauge performance. Third, in any event, Plaintiff fails to explain why (or cite authority suggesting that) two weeks was inadequate to gauge performance.

Since Plaintiff had been given the opportunity to participate and did not take advantage of the opportunity, the resulting dilution of Plaintiff's shares is a self-inflicted injury. None of Plaintiff's

---

[15] As noted above, the Court has no basis to believe that Kostuchenko's opinion is probative on the present "equal opportunity" issue, and in any it is not entirely clear that Kostuchenko's opinion was that equal opportunity necessarily requires that outside shareholders (like Plaintiff) had to have time to gauge performance before making a purchase (or non-purchase) decision.

arguments demonstrate a genuine dispute of material fact as to whether the Series C Stock Transaction was self-interested, so the business judgment rule applies. And, as above, because the business judgment rule applies, Defendant succeeds on its Motion for Summary Judgment.

### III. Expert Testimony

The Court does not consider the testimony of Thomas Uebler, Esq. offered in an affidavit (Doc. No. 233) that is supported by an expert witness report (Doc. No. 233- 1) to be sufficient to prevent summary judgment in favor of Defendant. His testimony briefly opines on the legal malpractice "case" against Defendant, where he opines that Defendant deviated from the legal standard of care (including by allowing the limitations period to run out on Plaintiff's claim) and that such alleged deviation (i.e., legal malpractice) caused Plaintiff to lose his underlying "case within the case." (*Id.* at 3). But for the most part, the testimony is about the "case within the case," as Mr. Uebler gives his view of the evidence that supposedly supported the (breach of fiduciary duty) claims Plaintiff hired Defendant to bring, opines as to what standard (the entire fairness standard, according to him) would have applied to such claims had they been brought timely by Defendant, opines that such claims would have been successful had they been timely brought, and opined that they would have yielded for Plaintiff a recovery greater than what he received when he ultimately settled his claims. (*Id.* at 3-5). Plaintiff argues that this testimony could persuade a reasonable jury that the "case within the case" would have been successful. (Doc. No. 231 at 17). Plaintiff does not provide a legal basis or explanation as to why an expert's testimony should be considered sufficient support of the case-within-the-case inquiry. *Id.* Defendant asserts that "such testimony is inadmissible on the grounds that it invades the Court's prerogative to interpret the applicable law." (Doc. No. 255 at 4).

Plaintiff left his argument far too undeveloped for the Court to consider it. *See, e.g., United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." (citation and internal quotation marks omitted)). Plaintiff's argument here indeed lacks flesh on the bones, inasmuch as, for example, it references the entirety of Uebler's affidavit (and that the affidavit itself "incorporates and summarizes his preceding Expert Witness Report") without mentioning anything in the affidavit or expert report. The entirety of the discussion is the one conclusory claim that "Mr. Uebler's [sic] addresses and resolves Baker Donelson's stated concerns regarding the strength of [Plaintiff's] case against the NextCare Defendants, but for Baker Donelson's negligence." (Doc. No. 231 at 17).[16] Accordingly, the Court declines to consider Uebler's testimony as sufficient proof that Plaintiff could succeed on the case within the case.[17]

---

[16] The same cursory treatment was given to deposition testimony of Gregory Del Gaizo, Esq., Plaintiff's former attorney. Plaintiff mentions Gaizo in a footnote with the statement that he would support "the merits of the breach of fiduciary duty claims" but without any further description or argument. (Doc. No. 231 at 17 n.2).

[17] Even if the Court considered this testimony, it is not apparent that this testimony is useful to the Court in deciding the issues discussed herein. It is true that expert testimony may be used to explain to a jury in a legal malpractice action the standard of care expected of an attorney. *See Innes v. Howell Corp.*, 76 F.3d 702, 711 (6th Cir. 1996) (noting that expert testimony can be offered in a legal malpractice case to explain to a jury the relevant standard of care in the legal profession or what an attorney's duties were to clients). But this kind of testimony goes to the legal malpractice "case"—not the "case within the [legal malpractice] case," which is the subject of Mr. Uebler's testimony. So the cited principle here does not help Plaintiff, as far as the Court can tell. Moreover, Mr. Uebler's opinions are to a substantial extent ones regarding questions of law (or mixed questions of fact and law, which amount to questions of law), and the judge does not require the insight of witnesses on questions of law. *See United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984) (holding that the permitting of expert testimony on a question of bankruptcy law was reversible error because it is impermissible for a judge to delegate the function of determining the law of a case to the jury). "[E]very circuit has explicitly held that experts may not invade the court's province by testifying on issues of law," *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001), and this holding applies not least to testimony on the "case within the case" in a legal malpractice case. The Court does not see where the testimony of Plaintiff's legal expert is sufficient to establish success on the "case within the case" at summary judgment when the Court itself has already determined that Plaintiff has failed to establish his case before this Court. Without any argument from Plaintiff as to the testimony's

## IV.    Rescissory Damages

Defendant argues alternatively that Plaintiff could not recover rescissory damages, but the Court forgoes addressing that argument because Defendant succeeds on summary judgment in any event.  The Motion to Exclude Rescissory Damages Expert is DENIED as moot.

## V.    Motion to File Under Seal

Defendant filed the Motion to File Under Seal in order to file under seal certain exhibits to a declaration offered in support of the Motion for Summary Judgment because those exhibits "were produced subject to a 'Confidential' designation by third-parties to this action." (Doc. No. 218 at 1). Defendant states that it does not believe the documents needed to be sealed but filed the motion pursuant to requirements of the Agreed Protected Order (Doc. No. 23). Pursuant to LR5.03, while the party using the information designated as confidential must file the motion to seal, the party who designated the materials has the burden to justify sealing the materials. No filing in support of sealing the documents has been made. The party that produced the documents subject to the third-party confidentiality designation shall file, within seven (7) days of the issuance of this Memorandum Opinion and Order, either a justification for keeping the document under seal (which may rely on any legitimate views or interests of the third party that designated the documents as confidential) or statement of why the documents are not confidential or otherwise are not appropriate for sealing.

---

probativeness regarding the "case within the case,"  the Court does not see how this testimony would serve to change the outcome the Court has indicated above.

CONCLUSION

The Motion for Summary Judgment (Doc. No. 214) will be GRANTED. The Motion to Exclude Shufeldt (Doc. No. 220) and Motion to Exclude Rescissory Damages Expert (Doc. No. 222) will each be DENIED as moot.

The Motion to File Under Seal (Doc. No. 218) remains pending and will be addressed in the corresponding order that will be entered contemporaneously herewith.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE